Jon B. Fougner (State Bar No. 314097)
jon@fougnerlaw.com
600 California Street, 11th Floor
San Francisco, California 94108
Telephone: (415) 577-5829
Facsimile: (206) 338-0783

[Additional counsel appear on signature page]

*Attorneys for Plaintiffs Dr. Sarbjit Dhesi and*
*Dr. Lonna Denny and the Proposed Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| DR. SARBJIT DHESI and DR. LONNA DENNY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>XPRESSION OF AWARENESS, INC., d/b/a "RETHINK CBD," a/k/a "CBD RETHINK,"<br><br>LOUIS WING,<br><br>YESSENIA GARCIA, and<br><br>HAMID MCHATET,<br><br>Defendants. | No. 3:19-cv-04210-YGR<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTION AND DAMAGES**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

Plaintiffs Dr. Sarbjit Dhesi and Dr. Lonna Denny, by their undersigned counsel, for this class action complaint against Defendants Xpression of Awareness, Inc., d/b/a "ReThink CBD," a/k/a "CBD ReThink" ("Xpression"), Louis Wing, Yessenia Garcia, and Hamid Mchatet, and their present, former, and future direct and indirect parent companies, subsidiaries, affiliates, agents, and other related entities, allege as follows:

## I.   INTRODUCTION

1. Plaintiffs, individually and as proposed class representatives for all others similarly situated, bring this action against Defendants for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

## II.   PARTIES

2. Dr. Dhesi is a natural person residing in this District.

3. Dr. Denny is a natural person residing in this District.

4. Xpression is a for-profit corporation.

5. Xpression is incorporated under the laws of Florida.

6. Xpression's principal place of business is in Miami, Florida.

7. Xpression has informed the Florida Department of State that its principal address is 11231 NW 20 Street, Unit 140-195, Miami, Florida 33172.

8. Mr. Wing is a natural person residing in Florida.

9. Ms. Garcia is a natural person residing in Florida.

10. Mr. Mchatet is a natural person residing in Florida.

11. Mr. Mchatet's address is 4958 SW 168th Avenue, Miramar, Florida 33027.

12. Xpression has informed the Florida Department of State that its CEO is Mr. Mchatet of 4958 SW 168th Avenue, Miramar, Florida 33027.

13. Xpression engages in interstate commerce including by sending advertisements into California.

## III.   JURISDICTION AND VENUE

14. <u>Jurisdiction</u>.  Under 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Plaintiffs' claims, because the TCPA is a federal statute, *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

15. <u>Personal Jurisdiction</u>.  This Court has personal jurisdiction over Defendants because a substantial part of the acts challenged in this complaint—namely, the delivery and receipt of the illegal facsimile advertisements—occurred in California, as was Defendants' intention.

16. <u>Venue</u>.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Plaintiffs reside in this District and a substantial part of the events giving rise to Plaintiffs' claims—namely, the delivery and receipt of the illegal facsimile advertisements—occurred in this District.

17. <u>Intradistrict Assignment</u>. Assignment to this Division is proper pursuant to Local Rule 3-2(c)-(d) because a substantial part of the events that give rise to Plaintiffs' claims—namely, the delivery and receipt of the illegal facsimile advertisements —occurred in Contra Costa County (San Ramon) and San Francisco County (San Francisco).

IV.   **THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227**

18. In 1991, Congress enacted the TCPA in response to a growing number of complaints about telemarketing.

19. The TCPA forbids sending unsolicited advertisements for goods or services via facsimile ("Junk Faxes").  47 U.S.C. § 227(b)(1)(C).

20. The TCPA requires that even those fax advertisements being sent to those with whom the advertiser has an established business relationship include an opt-out notice ("Opt-Out Notice").  *Id.* § 227(b)(2)(D).

21. In order to comply with the TCPA's Opt-Out Notice requirements, each fax advertisement must include, *inter alia*, all of the following:

   a) clear and conspicuous language on the first page stating that recipients may request that the sender not send any unsolicited advertisements and informing recipients that failure to comply with such a request within 30 days is unlawful;

   b) a 24/7 phone number that the recipient may call to submit a request to cease transmitting fax advertisements to the recipient; and

   c) a 24/7 facsimile number to which a recipient may send a request to cease transmitting fax advertisements to the recipient.

47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(4)(iii)-(v).

12. The TCPA provides a private right of action to recipients of illegal fax advertisements. 47 U.S.C. § 227(b)(3).

## V. FACTUAL ALLEGATIONS

### A. Xpression's Junk Faxing

22. Xpression's business is selling cannabis-based products that it claims treat pain.

23. Xpression's business model includes marketing through fax advertisements.

24. Recipients of Xpression's Junk Faxes, including Plaintiffs, are health care professionals or entities through which such professionals practice.

25. Defendants had no preexisting business relationship with the recipients of its facsimile advertisements.

26. The recipients of Defendants' facsimile advertisements had not invited or consented to receipt of such facsimiles.

27. Many of these recipients, including Plaintiffs, are chiropractors.

28. When Xpression sends Junk Faxes to practitioners, its goal is to sell them cannabis-based products that it claims treat pain.

29. Xpression's facsimile advertising included at least four batches of transmissions: in January, February, March, and June, 2019.

30. Xpression used WestFax to transmit at least some of its facsimile advertisements.

31. When they sent the faxes, Defendants were aware that unsolicited facsimile advertising was prohibited.

32. When they sent the faxes, Defendants were aware that unsolicited facsimile advertising was prohibited by the TCPA.

33. When they sent the faxes, Defendants were aware that facsimile advertisements must contain complaint Opt-Out Notices.

34. When they sent the faxes, Defendants were aware that facsimile advertisements must contain complaint Opt-Out Notices under the TCPA.

### B. Defendants

35. Mr. Mchatet is Xpression's CEO.

36. Mr. Mchatet is Xpression's owner.

37. Mr. Mchatet and Xpression treat each other as one and the same.

1   38. Mr. Mchatet has received salary from Xpression since January 1, 2019.

2   39. Mr. Mchatet has received salary from Xpression since January 1, 2019, exceeding the
3   reasonable value of his services to Xpression.

4   40. Mr. Mchatet has received dividends from Xpression since January 1, 2019.

5   41. Mr. Mchatet is responsible Xpression's strategic decisions.

6   42. Mr. Mchatet directs and has the power to block or terminate Xpression's marketing
7   campaigns, including facsimile advertising.

8   43. Mr. Mchatet has the power over and executive responsibility for Xpression's
9   personnel decisions.

10   44. Mr. Mchatet ultimately oversaw and approved the hiring of Ms. Garcia.

11   45. Mr. Mchatet ultimately oversaw and approved the hiring of Mr. Wing.

12   46. Mr. Mchatet ultimately oversaw and approved the retention, since January 1, 2019, of
13   Ms. Garcia.

14   47. Mr. Mchatet ultimately oversaw and approved the retention, since January 1, 2019, of
15   Mr. Wing.

16   48. Ms. Garcia is Xpression's Vice President of Operations.

17   49. Ms. Garcia has received salary from Xpression since January 1, 2019.

18   50. Ms. Garcia has day-to-day responsibility for overseeing Xpression's marketing,
19   including facsimile marketing, and has the power to block or terminate such marketing.

20   51. Ms. Garcia has day-to-day responsibility for overseeing Xpression's personnel
21   decisions.

22   52. Ms. Garcia oversaw and approved the hiring of Mr. Wing.

23   53. Ms. Garcia oversaw and approved, since January 1, 2019, the retention of Mr. Wing.

24   54. Mr. Wing is Xpression's salesperson.

25   55. Mr. Wing has received salary from Xpression since January 1, 2019.

26   56. Mr. Wing executed Defendant's facsimile advertising.

27   57. Mr. Wing executed Defendant's facsimile advertising with the knowledge and
28   approval of Mr. Mchatet.

58. Mr. Wing executed Defendant's facsimile advertising with the knowledge and approval of Ms. Garcia.

59. Mr. Wing drafted the advertisement.

60. Mr. Mchatet reviewed and approved the draft.

61. Ms. Garcia review and approved the draft.

62. Mr. Wing caused Xpression to buy at least one list containing names and fax numbers for chiropractors.

63. Mr. Mchatet approved Mr. Wing's sending the advertisement to the fax numbers on the list.

64. Ms. Garcia approved Mr. Wing's sending the advertisement to the fax numbers on the list.

65. According to Xpression, the seller of the list was Fredy Penagos of "Jubilant Marketing Solutions" a/k/a/ "Jubilant Solutions."

66. On Xpression's, behalf, Mr. Wing caused WestFax to send Xpression's facsimile advertisement to fax numbers on the list on or around June 20, 2019.

67. In this litigation, Xpression produced a spreadsheet named "Chiropractor_Fax_6-20-2019.xlsx" with 4,836 entries. It has two columns: "FAX Number" and "Company Name."

68. In Xpression's June advertising batch, at least 3,191 faxes were sent to at least 3,191 chiropractors listed in the file named "Chiropractor_Fax_6-20-2019.xlsx" produced by Xpression in this litigation.

69. In Xpression's June advertising batch, at least 2,763 faxes were received by at least 2,763 chiropractors listed in the file named "Chiropractor_Fax_6-20-2019.xlsx" produced by Xpression in this litigation.

70. As a result, Xpression generated sales to some of those chiropractors.

71. Some of those sales provided monies for the payment of wages, salaries, commissions, and/or bonuses to Mr. Mchatet, Ms. Garcia, and Mr. Wing.

72. Some of those sales provided monies for the payment of dividends to Mr. Mchatet.

### C.  Plaintiffs

73. Each of Plaintiffs is, and at all relevant times has been, a "person" as defined by 47 U.S.C. § 153(39).

74. On June 20, 2019, Defendants sent Plaintiffs the facsimile an exemplar of which and a template of which are reproduced at the end of this complaint (after the signature block).

75. The fax announced the commercial availability of Xpression's goods.

76. The fax gives several indications that it was sent by Xpression. For example:

   a) It claims to be from "Rethink CBD."
   b) It lists a "cbdrethink.com" URL and email address.
   c) It has a "ReThink" logo.

77. The fax advertisement was unsolicited.

78. The fax described itself as a "fax broadcast."

79. The fax lacked a TCPA-compliant Opt-Out Notice.  For instance, it lacked a fax number to which Plaintiffs could send a do-not-fax request.

80. The fax to Dr. Dhesi was addressed to "Sarbjit Dhesi Dc Qme Daapm Frccm Actar."

81. The fact that the fax was address to a gibberish addressee indicates that a large number of such faxes were populated by a process akin to "mail merge," used for mass-mailing (here, mass-faxing).

82. Other than the addressee line, the capitalization of which appears to be the result of a "title-casing" software script operated at a mass scale without human review, the fax was 100% generic.

83. Plaintiffs did not provide permission to Defendants to send them fax advertisements, or faxes at all.

84. Plaintiffs have never been customers of Defendants, nor have they ever been interested in being a customer of Defendants.

85. Plaintiffs' facsimile numbers appear in the file named "Chiropractor_Fax_6-20-2019.xlsx" produced by Xpression in this litigation.

86. The fax wasted Dr. Denny's paper and toner.

87. Plaintiffs and all members of the Class, defined below, have been harmed by the acts of Defendants because their privacy has been violated, they were subjected to annoying and harassing faxes that constituted a nuisance, and their fax lines were interfered with.

**D.    Xpression's Governance**

88. Xpression does not conduct regular board meetings.

89. Xpression does not regularly make minutes of board meetings.

90. Xpression lacks, and since January 1, 2019, has lacked, adequate capitalization to cover its potential and foreseeable liabilities in litigation, including this litigation.

### VI.    CLASS ACTION ALLEGATIONS

91. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), Plaintiffs bring this case as a class action on behalf of a class (the "Class").

92. The Class is defined as follows: All persons and entities to whom: (a) Defendants, any of them, and/or a third party acting on any of their behalf sent one or more faxes; (b) advertising Xpression's goods or services (d) at any time in the period that begins on July 23, 2015, and ends at the date of trial.  Notwithstanding anything herein to the contrary, excluded from the Class are Defendants, any entity in which any of Defendants has a controlling interest or that has a controlling interest in Xpression, Defendants' legal representatives, assignees, and successors, the judges to whom this case is assigned and the immediate family members of all of the foregoing.

93. The Class is so numerous that joinder of all members is impracticable.  The Class has more than 3,000 members.  It will be more efficient for the Court and the parties to resolve these alleged violations of the TCPA in one fell swoop than in thousands of individual lawsuits.

94. There are many questions of law and fact that have the same answer for all class members and the answers to which will be determinative of the outcome of the litigation. That is no surprise, given the generic nature and content of the fax. The common questions and answers include:

   a.    Who sent the faxes?  (Xpression, by Mr. Wing, under the supervision of Ms. Garcia and Mr. Mchatet.)

        b.       Were the faxes sent in order to make sales?  (Yes.)

        c.       Did the faxes contain a compliant Opt-Out Notice?  (No.)

        d.       Did Defendants obtain consent before sending facsimile advertisements?  (No.)

        e.       Where did Defendants get the list of phone numbers and addressees used for the "mail merge"?  (Fredy Penagos of "Jubilant Marketing Solutions.")

        f.       Did the faxes violate the TCPA?  (Yes.)

        g.       Were Defendants' violations knowing or willful, within the meaning of the TCPA?  (Yes.)

        h.       Should Defendants be enjoined from sending medical professionals unsolicited facsimile advertisements?  (Yes.)

95. Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs' claims and the claims of the Class arise from identical or similar boilerplate faxes and are based on the same provisions of the TCPA.

96. Plaintiffs will fairly and adequately protect the interests of the Class.

97. Plaintiffs have retained competent and capable attorneys with significant experience in complex and class action litigation, including TCPA class actions.

98. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.

99. The interests of Plaintiffs and their counsel are aligned with those of the proposed Class.

100. Defendants have engaged in a telephonically routinized course of conduct toward Plaintiffs and members of the Class.  The common issues arising from this repetitive conduct that affect Plaintiffs and members of the Class predominate over any individual issues.

101. A class action is the superior method for the fair and efficient adjudication of this controversy.

102. Classwide relief is essential to compel Defendants to comply with the TCPA.

103. The interest of individual members of the Class in individually controlling the prosecution of separate claims against Defendants is small because the damages in an individual action for violation of the TCPA are small.

104. Management of these claims is likely to present significantly fewer difficulties than are presented in many class actions because the faxes at issue are automated and because the TCPA articulates bright-line standards for liability and damages.

105. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities.

106. There will be no significant difficulty in the management of this case as a class action.

107. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class appropriate on a classwide basis.

## VII.   FIRST CLAIM FOR RELIEF
(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b))
On Behalf of Plaintiffs and the Class

108. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

109. Defendants violated the TCPA, 47 U.S.C. § 227(b)(1)(C), by sending fax advertisements for their goods.

110. Plaintiffs and members of the Class are entitled to an award of $500 in damages for each violation of the statute, which amount may be increased up to $1,500 for each willful or knowing violation. *Id.* § 227(b)(3).

111. Plaintiffs and members of the Class are also entitled to, *id.* § 227(b)(3)(A), and do seek an injunction prohibiting Defendants and all other persons who are in active concert or participation with them from sending fax advertisements.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of all members of the Class, pray for judgment against Defendants as follows:

A. Certification of the proposed Class;

B. Appointment of Plaintiffs as representative of the Class;

C. Appointment of the undersigned counsel as counsel for the Class;

D. A declaration that actions complained of herein by Defendants violate the TCPA;

E. An order enjoining Defendants and all other persons who are in active concert or participation with them from sending fax advertisements;

F. An award to Plaintiffs and the Class of damages, as allowed by law;

G. An award to Plaintiffs and the Class of attorneys' fees and costs, to the extent allowed by law, equity, and/or California Code of Civil Procedure section 1021.5;

H. Leave to amend this Complaint to conform to the evidence presented at trial; and

I. Orders granting such other and further relief as the Court deems necessary, just, and proper.

## IX. DEMAND FOR JURY

Plaintiffs demand a trial by jury for all issues so triable.

## X. SIGNATURE ATTESTATION

The CM / ECF user filing this paper attests that concurrence in its filing has been obtained from its other signatories.

RESPECTFULLY SUBMITTED on April 23, 2020.

By: */s/ Jon B. Fougner*
Jon B. Fougner

Anthony I. Paronich, *Pro Hac Vice*
anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 485-0018

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Andrew W. Heidarpour, *Pro Hac Vice*
aheidarpour@hlfirm.com
HEIDARPOUR LAW FIRM, PLLC
1300 Pennsylvania Avenue NW, 190-318
Washington, District of Columbia 20004
Telephone: (202) 234-2727

06-20-2019 12:03   305-592-7906   1/1

Special Product Notice For
## CHIROPRACTIC and WELLNESS OFFICES
**ATTN: Sarbjit Dhesi Dc Qme Daapm Frccm Actar**

ReThink CBD-Infused Topical products are a great alternative to OTC analgesics & opioids, providing relief from pain caused by inflammation.

ReThink CBD comes in pumps and roll-ons, and are applied directly to the skin to relieve achy muscles and joints. Help your patients ease their pain, and add new options to your treatments!






Naturally Grown | Made In The USA | Zero THC | Lab-Tested

Visit www.cbdrethink.com/Chiro or Call 786-961-3273 to learn about ReThink for Chiropractic offices.

Regards,
**Louis**

Louis Wing | louis@cbdrethink.com | Direct 786-961-3273

ReThink CBD is a company that is interested in helping you provide safe, naturally grown products that are a great addition to your existing wellness supplements. ReThink CBD products are lab-tested and guaranteed, certificates of analysis are available for every product we make.

You can Opt-Out of this fax broadcast anytime by calling 1-855-210-6098

**Special Product Notice For**

# CHIROPRACTIC and WELLNESS OFFICES

**ATTN: &lt;Company Name&gt;**

ReThink CBD-Infused Topical products are a great alternative to OTC analgesics & opioids, providing relief from pain caused by inflammation.

ReThink CBD comes in pumps and roll-ons, and are applied directly to the skin to relieve achy muscles and joints. Help your patients ease their pain, and add new options to your treatments!







Made with All-Natural ingredients and Full Spectrum (whole plant) hemp extract which includes all the cannabinoids and phytonutrients naturally found in the plants.

Naturally Grown | Made In The USA | Zero THC | Lab-Tested

Visit www.cbdrethink.com/Chiro or Call 786-961-3273 to learn about ReThink for Chiropractic offices.

Regards,
**Louis**

Louis Wing | louis@cbdrethink.com | Direct 786-961-3273

ReThink CBD is a company that is interested in helping you provide safe, naturally grown products that are a great addition to your existing wellness supplements. ReThink CBD products are lab-tested and guaranteed, certificates of analysis are available for every product we make.

You can Opt-Out of this fax broadcast anytime by calling 1-855-210-6098

FIRST AM. COMPL. INJUNCTION AND DAMAGES
*Dr. Dhesi v. Xpression of Awareness, Inc.*, Case No. 3:19-cv-04210-YGR